462 P.2d 782

**Charlotte M. JOHNSON, Appellant,**

**v.**

**Robert J. JOHNSON, Appellee.**

**No. 9745–PR.**

Supreme Court of Arizona.

In Banc.

Dec. 19, 1969.

Rehearing Denied Jan. 13, 1970.

James H. Garcia and Raymond Huffsteter, Phoenix, for appellant.

Price, Tinney & Lindberg, by John Price, Tucson, for appellee.

McFARLAND, Justice:

This case is before us on a petition for review of a decision of the Court of Appeals, 10 Ariz.App. 14, 455 P.2d 463, affirming the judgment of the trial court. The decision of the Court of Appeals. is vacated, and the judgment of the trial court is reversed in part and modified in part.

The Superior Court of Pima County, Arizona, on November 4, 1963, having jurisdiction over all the parties, decreed that the marriage relationship existing at that time between plaintiff Charlotte M. Johnson (Mrs. Johnson) and defendant Robert J. Johnson (Mr. Johnson) be dissolved. By the original decree Mrs. Johnson was awarded the custody of the minor child, Alan Johnson, now seventeen years of age, with visitation rights for Mr. Johnson. The decree also provided for payment of alimony and child support by Mr. Johnson.

On November 16, 1965, the decree was amended retaining the custody of Alan with Mrs. Johnson, but permitting her to remove Alan "from the State of Arizona, at any time, either permanently or temporarily"; also that in the event Mrs. Johnson moved her residence and that of Alan from Pima County she keep Mr. Johnson informed of her residence, Alan's activities and schooling, and permit Mr. Johnson to correspond with Alan without delay or hindrance.

The court further ordered that defendant (Mr. Johnson) might relieve himself from paying alimony by filing an affidavit in non-compliance with these provisions until such time as plaintiff (Mrs. Johnson) would appear before the court and show cause.

Under this authority Mrs. Johnson subsequently, together with Alan, changed her residence, first to Tennessee, thence to Utah, and, finally, about August 1967, she established her domicile in California and continues to reside there to this date.

On March 17, 1966, Mr. Johnson filed an affidavit of non-compliance with the court, and ceased making alimony payments. Further affidavits of non-compliance were filed by Mr. Johnson on the following dates: July 11, 1966; February 2, 1967; and September 14, 1967. He asserted in the affidavits that he was not receiving information regarding progress, activities and report cards of Alan—that he was not being furnished with the requested necessary information pertaining to Alan's vacations and that Alan was not sent to him for a scheduled visitation.

On May 16, 1968, Mr. Johnson filed with the court a petition for an order to show cause and to amend the decree of divorce. On the date set for hearing on Mr. Johnson's petition, the trial court specifically stated in the record that Mrs. Johnson was served with notice of the hearing by having been mailed copies of the appropriate documents to her last-known address of record (in California), and further stated that receipt of the docu-

ments by her was evidenced by a return receipt bearing her signature.

The trial judge, after stating in the record that neither Mrs. Johnson nor her attorney was present, proceeded with the hearing on Mr. Johnson's petition. After hearing, the trial court ordered as follows:

" * * * that portion of the Order of this Court dated November 16, 1965, providing that the Plaintiff shall retain the care, custody, and control of the minor child of the parties is vacated and that the care, custody, and control of the minor child of the parties, ALAN JOHNSON, is awarded to the Defendant, ROBERT J. JOHNSON, subject only to right of reasonable visitation in the Plaintiff, which right of reasonable visitation shall be later determined by the Court in the event there is any controversy over same; and it is further

"ORDERED that the provisions of the Order of this Court dated November 16, 1965, pertaining to the reaffirmation of the provisions of the original Decree entered herein and agreement between the parties as same applied to alimony and child support is vacated; and the Defendant is relieved from any further obligation under any Orders of this Court for support and maintenance payments for the minor child of the parties, effective this date, and is relieved from any support and maintenance payments or alimony payments to the Plaintiff effective March 1, 1966; and it is further specifically

"ORDERED that all alimony payments or support and maintenance payments heretofore ordered to be paid or agreed to be paid by the Defendant to the Plaintiff are terminated as of March 1, 1966; and it is further

"ORDERED that the Plaintiff having been found in contempt is sentenced to serve ninety (90) days in the County Jail of Pima County, * * *"

The record shows that Mr. Johnson received some letters from Mrs. Johnson and

her attorney advising him of Alan's health, progress in school, and the new address, when Mrs. Johnson and Alan left Utah for California. In fact, Mr. Johnson testified that:

"* * * I have gotten notes from lawyers saying that he was in good health * * * I have had correspondence with his mother on that to the extent that she wanted to go ahead with orthodontist work * * *"

Regarding Mrs. Johnson's failure to send Alan to Arizona for visitation purposes, he testified:

"Q Going to the summer of 1966, did you attempt to comply with the order of this Court to arrange for summer vacation?

"A Yes.

"Q And what did you do?

"A I first asked the dates that he would be out of school, and this was furnished by Charlotte, and I made arrangements and had a ticket at the Frontier Airline Counter in Salt Lake City for him to pick up, and I wrote her telling her of the arrangements.

"Q Did you receive any correspondence from the—or any response of any kind to the letters and the arrangements you were making?

"A Not directly, I got a phone call from a lawyer stating that she wasn't going to send him."

Mr. Johnson did not testify as to the reason given him by the attorney as to why Alan was not sent to Arizona, and there is nothing in the record to show that Mrs. Johnson wilfully did not send the boy, or if there was a good reason for not sending him.

. Apparently at the time of the present hearing Alan had become involved with the juvenile authorities in California, as was stated by Mr. Johnson:

"Q What is his present status, if you know?

"A His—he is with his mother. He was released to his home, and the hear-ing was set originally for last week, and then by your inquiries to the probation officer listed on that form, we found out that it had been continued to the 13th of June.

"Q What is he charged with in this connection, do you know?

"A The charges are, one is grand theft, and the other is burglary.

"Q Do you know any of the details as set forth in the petition?

"A Not a thing."

Mr. Johnson did not testify of any effort he had made to assist his son in his present difficulty, nor does he definitely state he will do so if the decree is modified, as indicated by the following testimony:

"Q You know that he may be detained there as a result of this juvenile hearing, and possibly put on probation?

"A Yes, I assume that is one of the possibilities.

"Q And if he should be put on probation, and under the direction of the juvenile authorities in Los Angeles, is it your intention to go over there and make your wants as to custody known to the juvenile authorities in California?

"A Yes, I believe I will.

* * * * * *

"Q And is your current wife anxious and willing to have him come there if the Court should order that the change of custody be granted?

"A Well, I don't know if you can say anxious, she has some misgivings with this lastest [sic] thing and what effect it might have on our son; however, she is willing to see what we can do with him.

"Q Do you feel that you could supervise his schooling here in Tucson to say that if he needs any special help of any kind because of the bad marks he has been getting over the years that he might get that special help?

"A I try to.

"Q And do you feel that it would be to the best interests of Alan if custody were awarded to you at this time?

"A I think so."

The facts in the instant case show that Mrs. Johnson, under authority of the modified decree of the Superior Court of Pima County, legally changed her domicile and that of the minor child, Alan, to the State of California; that neither the mother nor Alan were physically present in the State of Arizona nor personally served with process in the State of Arizona; that their domicile is in the State of California, and that Alan was at the time of the hearing under the jurisdiction of the juvenile authorities of that state. The questions presented by the mother are:

(1) Whether under these facts the court had jurisdiction to change the custody of the minor child to Mr. Johnson;

(2) Does the court have jurisdiction to cancel alimony accrued before petition is made to modify the decree?

(3) Does the court, under the facts set forth in Question No. 1, have jurisdiction to find plaintiff in contempt of court for failure to comply with a writ of habeas corpus where the plaintiff is not personally served with the writ in the State of Arizona?

The answer to the first question requires a determination as to whether the jurisdiction of a court having original jurisdiction to award the custody of a child continues after the domicile of the child and the party given custody thereof has been changed to another state. The question is similar to that posed by Professor Ehrenzweig:

"§ 87. A mother, having received the award of her child's custody, moves to another state. The father, seeing his right of visitation put in jeopardy, seeks a change of the decree in his favor, and the court, loyal to the more faithful citizen, now awards custody to him. Should the judge of the mother's new home state accept this change? And again, what should be done if the father, having twice been denied the child, uses his first visit to acquire 'possession' and removes the child to another state himself? What is any judge to do when faced with vivid descriptions of a child's plight caused by the alleged misdeeds of an absent parent or the 'error' of a distant court? Should he give 'full faith and credit' or 'comity' to the sister state's decree, or should he follow his own views regarding the welfare of the child now within his territory?"—Ehrenzweig, Conflict of Laws, § 87, p. 287 (West Pub. Co. 1962)

The courts of the several states have followed different rules in answering questions of the jurisdiction of the court where the domicile of the child is in another state.

Some have held that, once obtained, the jurisdiction is a continuing one, subject to modification regardless of the domicile of the parties, including that of the child. Others have adopted the theory of continuing jurisdiction in the state which issued the original decree with concurrent jurisdiction in the state of the child's domicile. Corkill v. Cloninger (Mont.) 454 P.2d 911. Still others hold that jurisdiction lies in the state where the child is legally domiciled and physically present. In re Guardianship of Fox, 212 Or. 80, 318 P.2d 933; 4 A.L.R. 2d 7, § 17. A development of the latter rule is that a state obtains jurisdiction of a nondomiciliary child and may alter a foreign custody decree if the child is physically present in the state of the forum, even though temporarily. Wicks v. Cox, 146 Tex. 489, 208 S.W.2d 876, 4 A.L.R.2d 1.

Some of those states which reject jurisdiction if the child is not a domiciliary, and those which accept jurisdiction despite the state of domicile, declaim that this is not a hard and fast rule. The Texas court, in Wicks v. Cox, supra, referring to it as a "rather unusual child custody case," assumed the child to be domiciled in Virginia, but upheld the jurisdiction of the Dallas District Court because the child and its

mother were physically present in the forum. But the court hastened to add:

"The foregoing does not, of course, mean that our courts should take jurisdiction to award custody in every case where the child and the parties contending for its possession happen to be here before the court. Nor does it mean that a child's foreign legal domicile is not an important consideration in cases of this kind. We certainly do not imply that our courts should be accessories after the fact to disorderly practices of individual parents or others who thus seek to avoid the normal processes of justice by ex parte determination of what they happen to consider a more propitious forum. A review of the decisions bearing on the subject shows the impracticability of trying to formulate rules in other than the most general terms. For example, the New York Court of Appeals, speaking through then Justice Cardozo, once put it thus:

" 'The jurisdiction of a state to regulate the custody of infants found within its territory does not depend upon the domicile of the parents. It has its origin in the protection that is due to the incompetent or helpless. Woodworth v. Spring, 4 Allen, Mass., 321, 323; White v. White, 77 N.H. 26, 86 A. 353; Hanrahan v. Sears, 72 N.H. 71, 72, 54 A. 702; Matter of Hubbard, 82 N.Y. 90, 93. For this, the residence of the child suffices, though the domicile be elsewhere. Matter of Hubbard, supra. But the limits of the jurisdiction are suggested by its origin. The residence of the child may not be used as a pretense for the adjudication of the status of parents whose domicile is elsewhere, nor for the definition of parental rights dependent upon status.' Finlay v. Finlay, 240 N.Y. 429, 148 N.E. 624, 625, 40 A.L.R. 937." Id. at 208 S.W.2d 878

On the other hand the Oregon court, in Application of Lorenz, 194 Or. 355, 241 P.2d 142, rehearing denied, sub nom. Ex parte Lorenz, 242 P.2d 200, after affirming that jurisdiction is lost after the child becomes legally domiciled in another state, added:

"We do not wish to be understood as holding that under no circumstances may the courts of this state assume jurisdiction over the welfare of a child not *domiciled* here. If a minor is found within this state who is deprived of parental care, control, and oversight, or who is neglected or abandoned and in need of protection, the courts of this state will afford at least temporary relief. The rule applicable is well stated in 43 C.J.S. Infants 50, § 4, as follows: 'A minor, deprived of parental care, control, and oversight, is considered a person under disability, a ward of the state, over whom the state may and should exercise its sovereign power of guardianship, through its duly constituted agencies; and, as parens patriae, may assume for him parental authority and duty. This power is not an unlimited and arbitrary one, and is exercised only in cases where the child is destitute of that parental care and protection to which he is entitled.' " Id. 241 P.2d at 151

■ Implicit in all the foregoing decisions is the overriding consideration for the welfare of the child of the broken marriage. This Court has emphasized that the primary, paramount, and controlling consideration is the welfare of the child.

■ The courts of the state of domicile are in a much better position to inquire into a change of circumstances surrounding children, and, under the doctrine of parens patriae, they have the primary obligation to care for the general welfare of their own citizens.

■ We have adopted this principle in making our determinations of the jurisdiction of the court in regard to cases where one of the parents has been given legal custody of a child, and has, with permission of the court, established a domicile in another state. In order to determine the best interest of the child there must be evidence of the conditions under which the child

lives. In a case involving custody this would be very difficult, and, in some instances impossible, to present properly to a court of a state other than of the domicile of the child and the parent. For example the child might be in the custody of a devoted mother who is not making any more money than is necessary for the support of herself and the education and support of the child. She would be unable to pay the expenses of witnesses, even if they would take the time to go to a far-away state to testify, or even pay the expense of taking depositions.

This Court, in In re Hughes, 73 Ariz. 97, 237 P.2d 1009, followed this principle. In that case the mother and father were divorced in California. The care and custody of the child was awarded the father. The father thereafter obtained a modification of the divorce decree permitting him to remove the child to Arizona.

He thereafter moved to Phoenix, Arizona, and the mother became a resident of the State of Texas. The mother went back to California, and secured a modification of the decree giving her the custody of the child. Neither the father nor the child were in the State of California, nor were they present at the hearing at which the decree was modified. We held jurisdiction was in the State of Arizona. In holding that California did not have jurisdiction, we said:

"* * * It is undisputed that at the time the decree was modified the father and Barbara Lynn were domiciled in Arizona, having moved here in January of that year, with the declared intention of permanently residing here. 'The minor child's domicil, in the case of divorce or judicial separation of its parents, is that of the parent to whose custody it has been legally given; * * *' Restatement of Conflicts, section 32. See also In re Webb's Adoption, 65 Ariz. 176, 177 P.2d 222. While the father contends that the California attorney who purportedly represented him at this last hearing did so without authorization, it is clear and undisputed that Barbara Lynn was not before the court nor even within the jurisdiction of the court at the time of rendition. From Restatement of Conflicts, section 117, we quote: 'A state can exercise through its courts jurisdiction to determine the custody of children or to create the status of guardian of the person *only if the domicil of the person placed under custody or guardianship is within the state.*' (Emphasis supplied.) See also Griffin v. Griffin, 95 Or. 78, 187 P. 598; and Duryea v. Duryea, 46 Idaho 512, 269 P. 987.

"In view of the facts in this case showing clearly that Barbara Lynn was not only physically outside the state of California but also legally domiciled in the state of Arizona at the time the above mentioned decree was modified, we hold that the modification is void and without force and effect. At the time of the hearing, in the lower court, the original California decree awarding custody of Barbara Lynn to her father, Samuel, was still valid and binding upon the parties, and respondent Samuel had rightful custody of Barbara Lynn. Therefore, in order to gain custody of Barbara Lynn it was necessary that petitioner Ruby show affirmatively that the decree should be modified, and there being no showing to that effect we affirm the ruling of the lower court granting respondent Samuel permission to retain custody of Barbara Lynn. * * *"

In that decision we recognized the rule that full faith and credit should be given to a decree of a court of another state at the time that it had jurisdiction of the minor and the parents. However, the paramount concern of the court in custody proceedings is the welfare of the child, so where change in circumstances has occurred since that decree which shows the welfare of the child would be better served by a change of custody such change could be made by the court having jurisdiction (in that instance, the Arizona court) by showing such a change in

conditions. This we made plain when we further said, in In re Hughes, supra:

" * * * This opinion is not to be interpreted however so as to prejudice the right of the petitioner, on a showing of a changed condition, to procure, at any future time, a modification of the decree relating to custody of such child."

We cited with approval Griffin v. Griffin, 95 Or. 78, 187 P. 598, where that court said:

"A judgment or decree of a court of one state awarding the custody of minor children in a divorce case is not res judicata in a proceeding in a court of another state, except as to facts and conditions before the court upon the rendition of the former decree. As to facts and conditions arising subsequently to such an award, the decree has no extraterritorial force, and the courts of other states are not bound thereby. A decree of a court of one state ordering the custody of a child is not binding upon the courts of another state under the full faith and credit clause of the federal Constitution after the child has become domiciled in the latter state. Such a decree as to a child has no extraterritorial effect beyond the borders of the state of its rendition. The courts of the second state will not remand the child to the jurisdiction of another state, especially where it is against the true interests of the child. The reason given for this rule is the fact that the children are the wards of the court, and the right of the state rises superior to that of the parents. Therefore, when a child changes his domicile from one state to another and becomes a citizen of the second state, he is no longer subject to the authority and supervision of the courts of the first state. 15 R.C.L. p. 940, § 417."

In Ex Parte Lorenz, supra, the Oregon Court reaffirmed its stand, as follows:

"In arriving at our ultimate conclusions in the instant case, we were persuaded by what we deemed to be the better reasoning of those authorities asserting the proposition that, unless the child is domiciled in the state, the court has no jurisdiction to inquire into what its welfare and best interests demand, except under certain exceptional circumstances as outlined by us, and that the determination of the court of domicile is entitled to full faith and credit in the state of the forum. As we pointed out in our opinion in this case, in the prior decisions of this court involving the custody of an infant whose custody had been awarded by a court of a foreign jurisdiction, and wherein we assumed jurisdiction to pass upon the question of its welfare, it appeared that the child had become legally domiciled in and a citizen of this state. It is fundamental that each state should be permitted to determine the status of its own citizens."

In Byers v. Superior Court, 61 Ariz. 284, 148 P.2d 999, we stated:

"The respondent makes the point that the provisions of such section would apply only if the court had jurisdiction of the children in the divorce proceedings. When the decree in the divorce was entered, the children and their mother were in Colorado and, under the decisions, we think the court was without power to give their custody to the wife.

" 'A foreign decree of divorce awarding custody of the children, entered when neither defendant nor the children were within the jurisdiction of the court, so far as the award of custody is concerned, is of no effect for want of jurisdiction. So also the order of a court awarding the custody of a child of parents divorced in a foreign state is beyond the court's power, where the child's domicile is in such foreign state; * * *.' 19 C.J. 367. See also 27 C.J.S., Divorce, § 333."

However, we wish to make it indelibly clear that our holdings do not countenance the "stealing" of a child and taking it to another state for the purpose of obtaining jurisdiction there. That would not change

the legal domicile of the child.[1] This was clearly expressed in Ex parte Lorenz, supra:

"The rule we have adopted will, as a whole, tend to discourage kidnapping, as well as contempt for the lawful decrees of a court of a sister state. An opposite rule, as contended for by defendant, would not only place the stamp of approval upon kidnapping and contempt, but would make this state a mecca for all persons seeking to evade the jurisdiction of the courts of the state of their original domicile. It would amount to a tacit admission, at least, that our own decrees in similar situations are of no effect beyond our boundary lines.

"We quote from the author of the note in 4 A.L.R.2d at page 15, as follows:

" 'In a few cases, notably those from the state of Washington, it has been the policy of courts, on finding the child within its borders but domiciled in another state, not to decide the question of proper custody on the merits—barring exceptional cases of temporary custody arising out of immediate emergency— * * *.

" '*It is submitted that the adoption of such a policy by the courts generally would tend to discourage kidnapping by parents or evasion of the jurisdiction of the domicil by physical removal elsewhere.* To be sure, the courts generally profess to condemn such conduct, *but so long as a party has reason to believe that he may fare better in a foreign court, the assumption of jurisdiction by foreign courts will tend to encourge the practice.*' (Italics ours.)"

This is called the doctrine of unclean hands. See Ehrenzweig, supra, § 88, p. 293.

Under the state of facts in the instant case we hold that the court exceeded its jurisdiction in changing the custody of Alan from Mrs. Johnson to Mr. Johnson.

It would seem that if the appellee feels that he has a well-founded case he should not hesitate to bring it before the proper California court where all the evidence relative to the welfare of the child is readily available.

The second question is whether the trial court erred in cancelling accrued payments for alimony and child support. The court's order, filed on June 7, 1968, relieved the appellee from further payments as of March 1, 1966. The appellee had already ceased making these payments, relying on his affidavit filed on March 17, 1966, and the amended order, dated November 16, 1966. That order said, in part:

"Further, that in the event the Plaintiff moves her residence and that of the minor child of the parties from the State of Arizona, permanently or temporarily, and while so absent from the State of Arizona Plaintiff fails to comply with any of the terms of this order, or any future order the Court may enter in this matter, that upon Defendant filing with this Court his affidavit setting forth specifically the facts of such non-compliance, all future alimony payments due Plaintiff from Defendant, after date of filing said affidavit, may be suspended by Defendant until such time as Plaintiff appears before this Court and shows cause why the Court should reinstate payment of said alimony payments on a current or retro-active basis. * * *"

There is no provision in the law, nor could there be, that a party himself may decide to stop alimony and support payments by

[1]. The cases following this theory hold that the domicile must be in a state to give the court jurisdiction to change custody. Serving a parent where the parent and child are temporarily in a state does not give the court of the state of temporary residence jurisdiction, or deprive the state of domicile of its jurisdiction. The violation of orders of the court where jurisdiction is based on temporary residence is not always such that it offends the doctrine of unclean hands. While other matters were discussed, and the ruling based primarily on the change of circumstances, this was in effect the holding in In re Guardianship of Rodgers, 100 Ariz. 269, 413 P.2d 744.

the mere filing of an affidavit. That part of the November 16th order that purported to give Mr. Johnson this privilege is a nullity in that it constitutes an unlawful delegation of the court's authority to determine facts which justify a modification of payments. Under this provision of the decree the father makes an ex parte determination that the mother has not complied with the order of the court, and by filing an affidavit of such determination setting forth the facts upon which he made such a finding of non-compliance stops the payment to an indefinite date. For them to be re-instated the mother must file a petition showing cause why payments should be resumed on a current or retroactive basis. The courts have held that such power is vested only in the court and may not be delegated to any one else. Washburn v. Washburn, 49 Cal.App.2d 581, 122 P.2d 96.

In the case of Washburn v. Washburn, supra, in passing upon the authority of the court to delegate its power of decision in regard to custody of children, it was held:

"Under the Constitution of this state the judicial power to award the custody of children is vested in the courts alone, and in the exercise of that power the law requires a full hearing and a decision on the evidence produced under oath or upon the stipulation of the parties. The power of decision vested in the trial court is to be exercised by a duly constituted judge, and that power may not be delegated to investigators or other subordinate officials or attachés of the court, *or anyone else. * * *"* (Emphasis added.]

See also Rea v. Rea, 195 Or. 252, 245 P.2d 884, 35 A.L.R.2d 612; Hosford v. Henry, 107 Cal.App.2d 765, 238 P.2d 91; Nelson v. Nelson, 180 Or. 275, 176 P.2d 648.

We accordingly hold that the order of the court terminating alimony could be retroactive only to the date of the filing of the petition on May 16, 1968. McClanahan v. Hawkins, 90 Ariz. 139, 367 P.2d 196; Johnson v. Johnson, 46 Ariz. 535, 52 P.2d 1162.

■ Our holding that the trial court lacked jurisdiction to change custody of

Alan Johnson disposes of the issue of Mrs. Johnson's alleged contempt. Therefore, the contempt judgment is of no force or effect.

The decision of the Court of Appeals is vacated; the judgment of the Superior Court relating to custody and contempt is vacated; the judgment regarding payments of alimony and child support is reversed, and the matter remanded to the Superior Court for further proceedings consistent with this decision.

UDALL, C. J., LOCKWOOD, V. C. J., and STRUCKMEYER and HAYS, JJ., concur.