NATIONAL LABOR RELATIONS BOARD
v. INTERNATIONAL UNION, UNITED
AUTOMOBILE, AIRCRAFT AND AGRI-
CULTURAL IMPLEMENT WORKERS
OF AMERICA, CIO, LOCAL 291, et al.

No. 10490.

United States Court of Appeals
Seventh Circuit.

Feb. 4, 1952.

David P. Findling, Associate General Counsel, A. Norman Somers, Asst. General Counsel, Edward Friedman, Attorney, National Labor Relations Board, George J. Bott, General Counsel and Dominick L. Manoli, all of Washington, D. C., Rosanna A. Blake, Takoma Park, Md., Attorneys, National Labor Relations Board, for petitioner.

Max Raskin, O. S. Hoebreckx, Milwaukee, Wis., Benjamin T. Gunz, Oshkosh, Wis., for respondents.

Before MAJOR, Chief Judge, and KERNER and DUFFY, Circuit Judges.

DUFFY, Circuit Judge.

The National Labor Relations Board (hereinafter called Board) petitions for the enforcement of its order issued December 27, 1950, against respondents, International Union, United Automobile, Aircraft and Agricultural Implement Workers of America, CIO, Local 291, and certain agents and officers thereof (hereinafter collectively called the Union). The Board found that the Union had violated Secs. 8(b)(2) and 8(b)(1)(A) of the Act,[1] by causing the Wisconsin Axle Division, The Timkin-Detroit Axle Company (hereinafter called company) to discriminatorily discharge Vernon J. Luebke, and also by attempting to cause the company to discriminatorily discharge 22 other employees.

Prior to 1946, there was no contract requirement that the company's employees as a condition of employment become or remain members in good standing in the Union. On July 8, 1946, the company and the Union executed a collective bargaining contract which contained a maintenance of membership clause which provided: "Sec. 1. The members of the Union as of July 8, 1946 and those who thereafter become members of the Union shall be required as a condition of employment to remain good standing members of the Union for the duration of this Agreement. If any dispute arises as to whether or not an employee is or is not a member of the Union, the question shall be adjudicated by the Arbitrator whose decision shall be final and binding on the parties."

The parties to the contract also drafted a "Memo of Intent." Item I thereof stated: "It is contemplated by the language appearing in Section 2 of Article II that only good standing members of the Union as of the date of the contract have the right of severing their membership in the Union. That suspended members as of that date may not exercise their right of withdrawal from the Union unless and until they have first reinstated their good standing membership in the Union by the payment in full of their financial delinquencies."

Vernoñ Luebke had joined the Union in 1937, but took no part in Union activity after March, 1938, and did not consider himself a member of the Union. On September 6, 1946, the Union filed a grievance with the company, demanding that Luebke be discharged for having failed to maintain his Union membership in good standing. The Union asserted that Luebke was a suspended member who could not have withdrawn from Union membership without making up his past financial delinquencies which covered the period from March, 1938, to the date of the grievance. The company refused to discharge Luebke and the matter was referred to an arbitrator who issued an award on March 31, 1947, finding that Luebke was a "suspended member" within the meaning of the memo of intent and as such was "required to pay all past financial obligations" to the Union as a condition of employment.

The company once more refused to discharge Luebke and on April 14, 1947, the Union again wrote to the company demanding his discharge. When the company persisted in its refusal to discharge Luebke, the Union filed a complaint with the Wisconsin Employment Relations Board (hereinafter called Wisconsin Board), charging the company with failure to abide by an arbitration award.[2]

On November 17, 1947, the Wisconsin Board issued its decision and order, and although disagreeing completely with Arbitrator Marshall's holding in the Luebke case, directed the company to comply with

---

1. National Labor Relations Act, as amended, 61 Stat. 136, 29 U.S.C.A. § 151 et seq.

2. The complaint was based on Secs. 111.06(1) (g) and (f), Wis.Stats., which made it an unfair labor practice for a member "to violate the terms of a collective bargaining agreement (including an agreement to accept an arbitration award)."

the arbitrator's award.[3] On December 5, 1947, the company discharged Luebke.

In the meantime the Union had written to 22 other employees whom they designated as "suspended members," and, after referring to the arbitrator's award in Luebke's case, suggested that they make arrangements to "clear this matter up." When they failed to take any action the Union on June 30, 1947, filed grievances with the company, identical to those filed with respect to Luebke. These 22 men had joined the Union in 1937. Some had paid dues for one month. Others had paid dues for a few months in 1937, and several for one or more months in 1938. Only one had paid dues after 1938, and he paid none after 1940. The respective amounts assessed by the Union against these members ranged from $178.50 to $219.50.

The grievances against the 22 employees were also submitted to an arbitrator before whom the company and the Union, on September 4, 1947, stipulated that such cases as the arbitrator found to be factually similar to the Luebke case would be governed by the decision of the Wisconsin Board (not at that date issued) in that case. The arbitrator issued his award on April 12, 1949, finding that all 22 cases were similar to the Luebke case, and ordering the company to discharge each of such employees who did not pay the amount of past dues claimed by the Union. The company refused to comply with the award and the Union on April 28, 1949, filed charges with the Wisconsin Board, claiming the company was guilty of unfair labor practices. The company and 19 of the employees respectively commenced actions in the Circuit Court of Winnebago County on May 13 and May 14, 1949, asking the court to set aside the second arbitrator's award.

The Board found that the Union violated Sec. 8(b)(2) of the Act by causing the company to discharge Luebke, and attempting to cause the company to discharge other employees for their alleged failure to maintain their Union membership in good standing during a period when there was no contractual requirement therefor. The Board found that since the employees were being required to pay in full for past unpaid Union obligations which had arisen at a time when there was no obligation to maintain membership in the Union as a condition of employment, the Union, in demanding and insisting upon the discharge of these employees, was causing and attempting to cause the employer to discriminate unlawfully against them, in violation of said Sec. 8(b)(2). The Board further found that the Union, by its conduct, also restrained and coerced its employees in the exercise of their rights under the Act, thereby violating Sec. 8(b)(1)(A) of the Act.

The Board ordered the Union and its officers and agents to cease and desist from the unfair labor practices found; to notify the company and Luebke that it has no opposition to the immediate reinstatement of Luebke; to make Luebke whole for any loss of pay suffered because of the discrimination against him; and to post the usual notices.

The Union contends that as the law in force and effect when it filed its charges concerning Luebke did not contain any provisions governing unfair labor practices by labor organizations, it cannot be held responsible for Luebke's discharge by the company, even though such discharge occurred after August 22, 1947, the date when the Labor Management Relations Act of 1947 became effective. In the review presently before us, the union is not objecting to the Board's findings and order in so far as it relates to the 22 employees other than Luebke.

■ We think that upon the record as a whole substantial evidence sustains the Board's findings that the Union violated Sec. 8(b)(2) of the Act by causing the company to discharge Luebke and attempting to cause the company to discharge 22 other employees for their alleged failure to retain their Union membership in good standing as required by the 1946 agreement.

3. Although the decision of the Wisconsin Board is not in the record, from other documents it appears that in spite of the view of the Wisconsin Board that the arbitrator's award was incorrect, it felt compelled to hold that refusal by the company to comply with the award, was, under Wisconsin law, an unfair labor practice.

The attitude of the Union toward Luebke and the other 22 employees was precisely the same. The charge of unfair labor practice because of the retention of Luebke was the "pilot case." When the arbitrator's award was favorable to the Union's position, identical charges were filed against the company by the Union, claiming unfair labor practices in the retention of the other 22 employees. As in the Luebke case, the company refused to accede to the demand for discharge and again the Union took the matter to arbitration. Thereafter, on September 4, 1947, the Union and the company stipulated that the final disposition of the Luebke case, then pending before the Wisconsin Board, would govern the disposition of the grievances as to the other 22 employees.

The Union argues that its last appearance in the Luebke matter was on June 6, 1947, a date prior to the effective date of the new Act, and it insists it took no affirmative action after that date. Such discounting of the stipulation which the Union signed on September 4, 1947, which made the final disposition of the Luebke case determinative of its charges referring to his 22 fellow employees, may be convenient, but is not persuasive.

It is very unrealistic for the Union to now insist that it did not cause Luebke's discharge. If not, who then was responsible? Surely not the company which consistently and persistently resisted the Union's efforts to cause Luebke's discharge. The proceedings before and final action of the Wisconsin Board were the direct result of the complaint filed by the Union. The Union did everything it could to sustain its charges before the Wisconsin Board. After June 6, 1947, there was nothing further for it to do affirmatively in the Luebke procedure. Thus, it was the Union, and only the Union, which was responsible for the discharge of Luebke.

Nothing in this record suggests that after August 22, 1947, the Union no longer insisted on Luebke's discharge or had abandoned its demands as to him. Indeed the contrary attitude is shown by its continued assertion of analogous demands upon the company relating to 22 similarly situated employees. The stipulation, which provided that "a final decision in the case involving Vernon Luebke (now before WERB) * * will control the disposition of each of the above grievances that an Arbitrator shall find falls within the facts and the decision of the Luebke case," was signed on September 4, 1947. It is our opinion that substantial evidence supports the Board's findings that Luebke's discharge was caused by the Union.

We now reach the question whether causing Luebke's discharge was a violation of Sec. 8(b)(2) of the Act. Under Sec. 8(b)(2) it is an unfair labor practice for a labor organization or its agents to cause or attempt to cause an employer to discriminate against its employees in violation of Sec. 8(a)(3) of the Act. Under Sec. 8(a)(3) of the amended Act, like the corresponding section of the original Act, it is an unfair labor practice for an employer to discharge an employee because of non-membership in a union, unless it is done pursuant to a valid union security agreement. National Labor Relations Board v. American Car & Foundry Co., 7 Cir., 161 F.2d 501, 502.

The real issue is whether a union can, without violating Sec. 8(b)(2) and Sec. 8(b)(1)(A) of the Act, compel an employer, under the provisions of a union security agreement, to discharge an employee for failure to pay past union dues and fees which had arisen prior to the execution of that agreement and during a period when there was no contractual or other obligation upon the employee to maintain membership in the union as a condition of employment.

Neither Sec. 8(3) of the original Act, which was in force when the 1946 agreement was executed, nor Sec. 8(a)(3) of the amended Act, which was effective when Luebke was discharged and when the Union was still actively seeking the discharge of the 22 employees, sanctioned such a retroactive application of a union security agreement. An employer who discharges employees upon the basis of such a retroactive application of an agreement is discriminating against them in violation of

the Act. It was so held in Colonie Fibre Co., Inc. v. National Labor Relations Board, 2 Cir., 163 F.2d 65. There the employer, pursuant to a union security agreement, discharged several employees who did not maintain their membership in the union during a period when there was no agreement between the employer and the union. Holding that the employer had violated the statutory prohibition against discrimination in thus discharging the employees, the court said, 163 F.2d at page 67: " * * * That proviso (Sec. 8(3)), in sanctioning contracts which require membership in a union as a condition of employment, does not sanction contracts which require *past* membership as such a condition. A construction permitting such a retroactive requirement would be inconsistent both with the terms of the Act and with the principle of free self-organization which the Act is designed to protect."

■ Had the company on its own initiative discharged Luebke, its action in that respect would have been in violation of Sec. 8(a)(3) of the Act. Since it was the Union which demanded and insisted that the company discharge Luebke and which caused his discharge by setting in motion the proceedings which resulted in termination of his employment, thereby causing the company to violate Sec. 8(a)(3) of the Act, the action of the union falls squarely within the proscription of Sec. 8(b)(2) of the Act.

■ Sec. 8(b)(1)(A) makes it an unfair labor practice for a labor organization "To * * * restrain or coerce employees in the exercise of the rights guaranteed in section 7." Sec. 7 in turn guarantees to employees the right to refrain from joining labor organizations except to the extent that such right is affected by an agreement between the union and the employer, executed in conformity with the provisions of the statute. It is evident that Sec. 8(b)(1)

(A) is intended to prevent the use of economic pressure by labor organizations to force employees to acquire or retain union membership as a condition of employment except to the extent permitted by a valid union security agreement. We think that the Board correctly found that the Union had, by its conduct, restrained and coerced Luebke and other employees in the exercise of the rights guaranteed to them by the Act. Union Starch & Refining Co. v. National Labor Relations Board, 7 Cir., 186 F.2d 1008, 1011.

■ The Union also asserted that the order of the Wisconsin Board, as well as the arbitration awards, precluded the Board from finding that the conduct of the Union constituted a violation of the Act. This argument cannot be sustained in view of Sec. 10(a) of the Act, which empowers the Board "to prevent any person from engaging in any unfair labor practice (listed in section 8) affecting commerce. This power * * * shall not be affected by any other means of adjustment or prevention that has been or may be established by agreement, law, or otherwise." Thus the Act confers upon the Board exclusive jurisdiction to prevent unfair labor practices within the meaning of the statute. The Board's exclusive function in this field may not be displaced by action before State agencies or by arbitration. Compare: Bethlehem Steel Co. v. New York State Labor Relations Board, 330 U. S. 767, 67 S.Ct. 1026, 91 L.Ed. 1234; La Crosse Telephone Corp. v. Wisconsin Employment Relations Board, 336 U.S. 18, 69 S.Ct. 379, 93 L.Ed. 463; Plankinton Packing Co. v. Wisconsin Employment Relations Board, 338 U. S. 953, 70 S.Ct. 491, 94 L.Ed. 588.

The petition of the National Labor Relations Board is granted and enforcement of its order of December 27, 1950, is ordered.